## Case No. 13,039.

### SMITH et al. v. EASTERN RAILROAD.

[1 Curt. 253; [1] 16 Law Rep. 401.]

Circuit Court, D. Massachusetts. Oct. Term, 1852.

MARITIME LIEN—MATERIALS FURNISHED TO CONTRACTOR—NOTICE.

1. The act of Massachusetts (St. 1848, c. 290) does not give a lien for materials sold, to a person who has contracted with the owner of a vessel to make certain repairs for a stipulated sum, the vendor having notice of such contract.

[Cited in Purinton v. Hull of a New Ship, Case No. 11,472.]

[Cited in brief in Parker v. Bell, 7 Gray, 434.]

2. The object of the act was to create liens on domestic vessels for repairs, supplies, &c., to the same extent as the general maritime law gives such liens on foreign vessels.

[Cited in Harbeck v. The Francis A. Palmer, Case No. 6,045a.]

3. By the maritime law, the vendor of materials, who sells them to a mechanic whom he knows to have contracted to make repairs for a stipulated sum and to whom, exclusively, he gives credit, can have no lien on the vessel.

[Cited in The Wandrahm, 14 C. C. A. 414, 67 Fed. 359.]

This was an appeal from a decree of the district court. The cause was heard on an agreed statement of facts, which was as follows: "The libel in this cause was filed in the district court of Massachusetts, on the 19th of August, 1851, by the libellants [Oliver Smith and others], copartners, and dealers in lumber, to enforce a lien claimed by them upon the steamboat owned by the respondents. Judgment was entered against the respondents by consent, and thereupon

1 [Reported by Hon. B. R. Curtis, Circuit Justice.]

they entered an appeal to this court. The case is submitted on the following facts: On or about the 18th of February, 1851, said boat being in need of divers repairs, the respondents made a written contract with one Nathaniel P. Roberts, by which he agreed to do a portion of the work, and make a portion of the necessary repairs and improvements on said boat. By the terms of the contract of which the libellants had knowledge, said Roberts was to furnish all the necessary materials, as well as perform all the labor for the repairs, for a certain sum stated in the contract. And he performed and completed his work about the 20th of July, 1851, having furnished all the materials, pursuant to his agreement, and the respondents paid him therefor in full, before notice of any claim made by libellants. The lumber used for said repairs, was furnished and delivered to Roberts by the libellants at divers times, partly at their shop, and partly at planing-mills, on his orders, to the amount of $1,075.13. And there was an understanding, before they began, that the libellants should furnish the materials for this job. At the times these materials were delivered, they were entered and charged in the libellants' books, and a transcript of such entries in the journal and ledger is annexed, marked 'A,' which, it is agreed, may be used instead of said books and entries, and be entitled to the same weight as the books and entries, if, in the opinion of the court, such books and entries are admissible and competent evidence for the libellants, which the respondents deny. About the time of the completion of said work, Roberts failed in business. Previous to February 18, 1851, Roberts had been a customer of the libellants, and had had a running account with them to the extent of several thousand dollars annually, for several years, on a credit usually of six months; bills therefor being rendered usually, on the 1st of January and July, in each year. At the time Roberts purchased the materials in question, nothing was said or done by him or by the libellants, indicating that the materials were not sold on the individual and sole responsibility of Roberts, nor was any thing said or done by either indicating that he purchased or they sold, in any other manner than previously. During the time of the purchases in question, Roberts bought other lumber of libellants, to the amount of about $100, and there was an unsettled account for lumber, on which Roberts owed them $600 or $700. Prior to 1st August, 1851, and after the work was completed, the libellants demanded payment of said Roberts of the bill of materials in question; and on the 13th day of August, 1851, the libellants caused a writ to be sued out against said Roberts, a copy of which and the papers in that suit may be referred to as a part of this statement. Before the filing of said libel, but after the respondents had paid Roberts in full, the libellants made a demand on the respondents for the amount of said bill. The deposition of Roberts, and the contract, may be referred to as a part of this statement by either party. The steamboat in question is of the burden of 242 $33/95$ tons, and without masts. She was enrolled and licensed under the laws of the United States, 19th August, 1842. The license expired 19th August, 1843, and no other has been taken out, and she has been employed only as a ferry-boat to carry passengers to and from the railroad in the harbor of Boston, between Boston and East Boston. If upon the foregoing facts the court shall be of opinion that the libellants had a lien on said boat, which they could legally enforce at the time of the filing of said libel, judgment shall be entered for the libellants for a sum to be agreed upon, and for costs; otherwise judgment shall be entered for respondents for costs."

Milton Andros, for libellants.

William Dehon, for respondents.

CURTIS, Circuit Justice. The lien asserted by the libellants depends for its validity upon the construction of the act of the legislature of Massachusetts, passed on the 9th day of May, 1848, entitled, "An act establishing a lien on ships and vessels in certain cases." The principal question is, whether by this act it was intended to create a lien, for the security of a debt, incurred for materials sold to one, who had entered into a contract with the owner of the vessel, to make certain repairs for an agreed sum of money, to be paid to him by the owner, of which contract the vendor of the materials had notice at the time of the sale. That it is competent for the legislature to provide for liens on domestic vessels, to secure not only the debts contracted by, or on behalf of the owner, for labor, materials, and supplies, but also debts contracted by those undertaking the repairs of such a vessel, must be admitted. Such laws, in respect to buildings on land, exist in many of the states, and there is an act of congress to the like effect in the District of Columbia, which received a construction by the supreme court, in the case of Winder v. Caldwell, 14 How. [55 U. S.] 434. The question is, whether this act was intended to apply to any other debts than those of the owner of the vessel.

The first section is as follows: "Whenever a debt is contracted for labor performed, or materials used in the construction or repair of, or for provisions and stores and other articles furnished for, or on account of, any ship or vessel within this commonwealth, such debt shall be a lien upon such ship or vessel, her tackle, apparel, and furniture, and shall be preferred to all other liens thereon except mariners' wages." The terms of the section are not decisive respecting this question. "A debt contracted," may mean

by or on behalf of the owner of the vessel, or by and on behalf of one who, having undertaken the repairs, purchases the materials on his own account, and uses them upon the vessel in the execution of his contract. The intention of the legislature can be arrived at only by considering the nature of the act, and of the rights involved in it, and its adaptation to carry out the object contended for by the libellants. If the act is to be so interpreted as to embrace this case, it is obvious that by its operation double liens were created; one, securing the stipulated price agreed to be paid to Roberts for all the work and materials under his contract with the owner, and others securing to the libellants, and all persons with whom Roberts contracted for materials and labor, the prices he agreed to pay therefor. The act contains no provision for marshalling these liens, or for restricting the amount of those of the second class, to the contract price agreed to be paid to Roberts by the owners, nor for any means of protecting the owners, by notice or otherwise, against being compelled to pay twice for the same materials. Suppose Roberts had filed his libel to enforce his lien for the contract price; according to this act he must have had a decree. No authority is given to call in other parties with whom Roberts contracted, in order to ascertain whether debts are due to them, for materials used in the repairs, and the owners would ordinarily have no means of knowing with whom Roberts contracted for materials. And yet, having forced the owners to pay Roberts, if he failed to meet his own engagements, the court would be compelled, on the application of those who had sold materials to him, to make a decree in their favor; and thus oblige the owner, who was in no fault, and had neglected no means of self-protection, to pay Roberts's debts, contracted at his discretion, both as to amount and terms of credit, in addition to their own. This practical operation of the construction contended for, is so unjust, that I cannot suppose the legislature intended it. It would require very clear language to convince me that the law was designed to give rights which cannot exist, without producing so much embarrassment and wrong, that it would be really beneficial to no class of persons.

These views are strengthened by looking at other acts passed by the legislature of Massachusetts upon a kindred subject, and which may, therefore, be considered as in pari materia. Besides the provisions of the Revised Statutes, on this subject, there are two acts now in force for securing to mechanics and material-men payment for labor and materials used in erecting or repairing buildings on land—the Acts of the 24th day of May, 1851, and of the 21st day of May, 1852. The first applies only to labor; and it provides, in terms, for contracts with the owner, "or other person who has contracted with such owner for erecting, altering, or repairing such building," &c.; and it requires a notice of the claim to be recorded in the registry of deeds, within sixty days after the labor is performed. The other act applies to labor and materials, and limits the amount of the liens of sub-contractors to the amount of the contract with the owner; and declares that there shall be no lien for materials, "unless the person claiming such lien shall, before furnishing such materials, have given notice, in writing, to the owner of the land, and to the person who has contracted with the owner of the land, that he intends to claim such lien, for materials furnished as aforesaid." It can hardly be supposed that the legislature should thus enable the owners of buildings to protect themselves against embarrassment and injustice, and at the same time leave the owners of vessels no means of doing so; or that they should have used clear and express terms to confer a lien on sub-contractors upon buildings, and intend to confer it on sub-contractors upon vessels, by a mere ambiguity. My opinion is, that so far as respects vessels already built and equipped, the object, and the whole scope of this act was, to create the same lien upon domestic vessels, for materials, repairs, and supplies, as existed by the general maritime laws of the United States upon foreign vessels. The second section of the act provides "that nothing in this act shall alter, or be construed to alter, or in any way affect, the lien as now existing on foreign ships and vessels." To them it was not designed to apply; probably for the reason that the regulation of liens upon vessels engaged in commerce between the several states, or with foreign nations, and not belonging to citizens of the state, is not a proper subject of state legislation. It is a regulation of commerce, within the power conferred on congress by the constitution. Now, it is true that, under the maritime law, materials and supplies are presumed to be furnished on the credit of the vessel and owners until the contrary is proved. But the contrary is proved, when it appears that the materials were sold to a mechanic for his own account. It is true that the libellants expected, when they sold these materials, that they would be used on the steamer, and that, in point of fact, nearly all of them were so used. But they knew that Roberts did not purchase them under any agency for the owners; that he purchased them for himself; that they became his property when delivered; that they were at his risk; and he was at liberty to make any use of them, he might please to make. They were, therefore, bought by him on his own account, and the credit must be deemed to have been given exclusively to him, for he was and was known to be, the sole debtor; and in such a case there is no lien by the maritime law.

It has been argued that this act ought to receive a liberal construction, for the security

of those whose labor and materials go to the benefit of owners of vessels, and that such liens are favored by the maritime law from sound policy. I entertain no doubt that the liens which that law creates, are for the advantage of commerce, and of the seamen, mechanics, and material-men, in whose favor they exist. But I am equally clear that, to give sub-contractors liens upon vessels, with no adequate means to work them out, without embarrassment and injustice to owners, would, in the end, benefit no one. Its practical effect would be, either to compel owners to employ only those who had so much capital, as to afford undoubted security that they would meet their engagements with third persons, or to transfer the business of repairing vessels, to places where the laws created no such dangers. And either of these effects would be injurious to the classes of persons, whom this law was intended to benefit. In my judgment, sound policy requires an observance, in the case of domestic vessels, of those limits prescribed by the general maritime law, which have been deduced by experience from the practical necessities of commerce, and of the interests of those connected with it.

The decree of the district court must be reversed, and the libel dismissed, with costs.